Good morning, Your Honor. My name is Alex Kortinsky. I'm representing the Petitioner Roman Kitsoula. I'd like at this time to reserve a few minutes for rebuttal time. Mr. Kitsoula was found ineligible for asylum by the Board of Immigration Appeals on the grounds that he failed to establish that the harm he suffered was at least in part an account of a protected ground, in this case being religion, and specifically that he was a member of the Ukrainian Greek Catholic Church. The Petitioner contends that the BIA's denial does not meet the substantial standard, substantial evidence standard, as sets forth. The BIA denied the case basically on three grounds. Number one, that he couldn't identify his attackers. Number two, that the police, he couldn't prove that the police were unable or unwilling to help him. And lastly, that he couldn't establish a nexus between his efforts in the reclamation process of obtaining properties back to the church, properties which were at the time being held by the government and in some cases even the Orthodox Church. Let me stop you just a minute before you get too carried away. And that is that withholding in Kat. Are we really talking about those today? No, we're not. Okay. With respect to the finding that he couldn't identify his attackers, I think that there's two issues involved in that. Number one, both the immigration judge and the board made a lot of references to his identity that the attackers belonged to a group called the Black Hundred or Chornosotniki, as was also referred in the administrative record. However, in his merits hearing, actually, Mr. Katsula indicated that he was not per se identifying his attackers as those groups. He was only indicating that it was his opinion to that effect. And he references that both on page 148 and 142 of the administrative record where he states, I don't have proof that this is the group. I'm only saying this is what I've heard. Didn't he refer to the Black Hundred in his asylum application? He did. And that clearly was a little overreaching on his part because this was speculation. He didn't have any evidence while he was in the Ukraine that this was some group called the Black Hundred. Somebody else mentioned the group to him. He comes to the United States, does some research on the Internet, says, well, that sounds like that could be the group that attacked me, and he included it on his asylum application. Well, that's true. He was offering an opinion. I mean, the first thing is the application he prepared in 1993, it was handwritten. He prepared it himself. I don't know that he made a distinction at the time whether he was making a factual assertion or asserting an opinion. I believe in his mind he wanted to put a face to his persecutors. And I think that obviously is something that's reasonable, but in his case it's not determinative. He never identified those folks as being Black Hundred while he was in the Ukraine and certainly didn't go to the police and say, I think members of the Black One Hundred are persecuting me. No, he did not. He basically said I'm being persecuted because of facts from which I'm deriving both on the threats that he received and the threats involved, stop your church activities, stop talking to people about reclaiming properties. And also during his attack, it's important, and this goes both to the identity of the attackers and also goes to the nexus of the claim. I think that during the attack, the attackers themselves said we're going to kill you. You didn't listen to their warnings. You have to stop your activities on behalf of the Greek Catholic Church, and that's in the administrative record on 124. So whoever really this group is really doesn't matter. We know that that group. Who would have had a motive to want to persecute him on that grounds? Well, we know from the 2000 report on human rights practices, which is Exhibit 5 on the record and 212 on the administrative record, we know that the government was unable to stop contentions and, quote, bitter disputes between the Orthodox and the Greek Catholics over buildings. So these could have simply been even lay members of the Orthodox Church. That's correct. Okay. Then it seems to me that the real problem is the problem that the BIA identified, which is that the evidence that the police were unwilling or unable to assist him is pretty thin. Yeah. And in that case, I think what we know is there's facts and there was speculation as to that. The fact is he indicated he reported the incident. He gave us information about who his attackers were. In this case, all of the attackers, which was four to five people, were wearing the same clothing. So we know that these were not some random folks. They had some sort of identity together with the black uniforms that they were wearing. And the testimony is arguably somewhat vague as to what the description was. Neither the immigration judge nor the government at the mayor's hearing tried to establish specifically what it is he said. But he was asked one question, which was, do you believe that the information you provided to the police was sufficient for you, for the police to find these assailants? And he said, yes, I do. And that testimony was never rebutted. What basis did he have for that? I'm sorry? What basis did he have for that? He couldn't even tell whether there were four or five of them. It was at night. He identified them as having dark, dark suits, which he had then identified as being perhaps some kind of paramilitary uniform. But he had no names. He had no physical descriptions that he was able to provide at any time during his testimony, even though he had ample opportunity to do so. If he couldn't provide that to us, how could he have provided anything more to the police and expect them to find it? Well, what we know is this situation is fairly analogous to situations we see in cases like Mashiri v. Ashcroft, decided by discord in Aguilera-Cotta. In both of those cases, the respondent didn't have an identity of who it was who was after him. Well, but we're not really after the identity. Even if we said that he didn't have to specifically identify because he has credibility under the BIA, he has credibility. Even if we don't find that. I guess my biggest problem is I don't find anything in this record to suggest that the police did not do what they needed to do to find these people. I mean, he says, did you report this to the police? Yeah, I reported it to the police. What did the police do? They were working on it. But later on, I was able to walk. I used to come in every morning. And they said, we'll find the guilty party. We'll take that person to court. Every step of the way, the police are saying, we're going to do it. Then, based on, I guess, his own intuition, because he never says anything more, they didn't get it done. But he doesn't have any idea why they didn't get it done. Well, we know from the testimony was that they never told them, listen, based on what you're telling us, don't bother coming to us. We know from the testimony. The police never said, don't bother coming in to us. Actually, they do. Actually, they don't. If you read on 179-180, the question is, did they ever tell you, give you any information that they had found the guilty parties? Then he says, and this is his subjective contention, they evidently would send me back saying, go away, don't bother us. Nobody ever says, not even in his testimony, that they said, go away. All he got was, from his very general idea, they didn't ever get them done, so they were evidently saying that. But if he went in every day, as he said he was, and nobody ever got it done, he could have that impression. That doesn't say the police weren't working on it. Well, again, this is an analogous situation to the Mashiri case, in which Afghans living in Germany were being persecuted by a group. He doesn't know. They went to the police. They don't have an identity who these people are. This court didn't find that to be determinative. In that case, what the court found to be determinative was that he was subjected to persecution via, just as in the Mashiri case, there were threats. There were death threats. There were threats of violence. Well, we're not really on that issue, counsel. We're not on the issue of whether there was persecution. If I give him credibility and I find there's persecution, I guess I'm trying to find where in this record do I find that the police didn't continue to try to find out what was going on here. What is your best evidence of that? From the fact that he went to the police on a regular basis. They never told him, forget about it. We're never going to find these people. In fact, they led him to believe that they were going to protect him. And finally, when he starts coming to them every morning to find out what you're doing about this case, they finally tell him, go away, don't bother us. They didn't say that. That is not in this record. Point to the place where it says, go away, don't bother us anymore, that the police said it. That's in the administrative record on page 124. Well, okay. I've looked at it. It doesn't seem to me. It seems to me that may be his impression. I didn't ever see where they said it. I believe I'll reserve the last few seconds of my time. Well, you're actually over your time, but I will give you a minute for rebuttal. Thank you. May it please the Court. My name is Kristin Morrissey, appearing on behalf of the U.S. Attorney General. Your Honor, as you've already discussed, I think the pivotal issues in this case are whether or not Kotswala established that he was harmed or fears harm from a group that the government is unable or unwilling to control, and whether his fear of future harm is an objectively reasonable fear. Do you agree the identity issue is a red herring, that that really doesn't matter, who the attackers were? I think in and of itself, his inability to identify his attackers isn't the crucial issue, but to the extent that it went to his inability to provide information or details to the police so that they could conduct a proper investigation, I think it undermines his claim that the police were unwilling or unable to protect him from these people, when his only description of them, as Your Honors had mentioned, was that four or five men dressed in black were his attackers. So I think to that point it's relevant, but in and of itself, as this Court has held, an inability to identify your attackers isn't. But, you know, doesn't the, you know, the common uniforms, the anti-religious statements, the threats, I mean, doesn't that suggest sort of a more organized or systematic problem here in that Mr. Kotswala was the target of an organized group? I think, based on the information in the record of this case, that it would require speculation to get to that point on the bare-bones description that he gave. He did provide some evidence that their objective was to make him stop his activities of getting the churches reclaimed to the Greek Catholic Church, but that's simply all of the evidence that we have within the record as it stands. If we're talking about an organized group, and this took place in a relatively small town, small village in Ukraine, correct? Yes. You know, doesn't it seem plausible that, you know, given low populations, small town, countryside, that the police, even given a bare-bones description, you know, and this guy was attacked at night, that an investigation would have, a reasonable or diligent investigation would have disclosed more than the runaround he seemed to be getting day after day after day? Your Honor, again, I think that that would require a fair amount of speculation, and in terms of, you know, whether or not he was given a runaround, there was no evidence that the police weren't investigating his claims, and, in fact, most of the information that he gave before the immigration judge was that they were working on it. They told him that they'd find the guilty party and bring them to court. He didn't provide any evidence to show that they had a bias or prejudice against him because of his religion, so I think that the record really is devoid of evidence that the police were not doing their job or making an investigation based on this very limited description that they had. The fact that he was credible and that his accounts are presumed credible, given the BIA's rejection of the IJ credibility finding, doesn't that lead us in a little bit different approach to this situation than you have explained? I mean, the fact that whatever he says is credible in this record, how do we undo that credible approach that we're supposed to give to everything that he says and come back around where you're coming? Well, I think even looking at Ketwala's testimony and evidence as credible, even accepting everything that he claimed to be true, he still hasn't established. Because he says that he thinks that the police should have been able to find these attackers, I mean, amounts to speculation, I think, on his part. I don't think that it necessarily follows that even if he's credible, that the court would have to take as true that the police should have been able to have found the attackers based on that description. But certainly accepting as true what the attackers looked like, what the police said to him, even accepting all of that as true, he still didn't establish the crucial prong to establish his past or well-founded fear claim of persecution, that the government was unwilling or able to protect him. If we find that he did suffer from past persecution and, therefore, he has a presumption, should we remand this case for a finding on the well-founded fear of future persecution? I think that in this case, if the court did come to that conclusion, that the Petitioner did satisfy all past persecution prongs here, that it would have to remand the agency. Because the agency never did specifically find that he established a past persecution claim and shift the burden to the government to rebut that presumption, a remand would be necessary for the agency to consider that claim and for the government to try to show such rebuttal evidence. And there is no individual analysis as to him as to what are the country conditions in that country, correct? I'm not... In this record, is there any individualized analysis as to the country conditions? I think it would be a limited analysis. I mean, the agency certainly showed that it took them into consideration and described his claims in comparison to the country conditions, but I'm not certain that there is an individualized analysis as you mentioned. I have no other questions. There are no other questions, Your Honor. For the reasons presented today and in the government's brief, we would ask that you deny the petition for review in this case. Thank you, counsel. Mr. Gortensky, I'll allow you another minute. I think what he can show is that the police are unable to control whoever this group is, whether we identify them as Black Hundred or some kind of Christian Orthodox thugs, it doesn't matter. The point is that they couldn't do anything about the repeated death threats that he was receiving indicated in... Do we have evidence? Is there evidence in the record that he reported the death threats to the police as opposed to the beating? There's no evidence directly on record that he reported the death threats. So all we have is that he reported the beating to the police and the police were unable to do... How is that different from any citizen in the United States going to the police and saying, you know, somebody hit my car or somebody burgled my house last night and then complaining vociferously when the police don't find the burglar or don't find the culprit who hit the car? Well, because in this situation, it lives in a vacuum in the sense that all of this is occurring as a result of his activities with the church. Both the death threats refer to... For the sake of argument, counsel, I will concede that he has been persecuted on account of his religious beliefs. We'll say there's no question to that. The question is, were the police unwilling to help him? The police were unable to help him, which is... But unable to help him is different from the kind of... Again, how does that differ from somebody in the United States saying, the police were unable to find the burglar at my house? Well, because the case law specifically on this says, if the police is just impotent to deal with this situation, and we know that the brother-in-law who was also involved in the reclamation effort, who also received death threats, was killed two years after he left. And he also received the same death threats involving asking him to stop his reclamation efforts. Thank you. Thank you. We appreciate both counsel. And Kitsula will be submitted.
judges: Tymkovich, Bybee, Smith N. R.